578 P.2d 325
**STATE of New Mexico,**
**Plaintiff-Appellee,**

v.

**Allen A. THOREEN,**
**Defendant-Appellant.**

**No. 2953.**

Court of Appeals of New Mexico.

Feb. 28, 1978.

Rehearing Denied March 13, 1978.

Writ of Certiorari Denied April 11, 1978.

626

Lynn Pickard, Pickard & Singleton, Santa Fe, for defendant-appellant.

Toney Anaya, Atty. Gen., Dennis Murphy, Asst. Atty. Gen., Santa Fe, for plaintiff-appellee.

## OPINION

WOOD, Chief Judge.

The sixteen counts of the indictment charged fraud, conspiracy to defraud, attempted fraud, or conspiracy to attempt fraud. All the charges involved financial dealings with Great West (Great West Savings and Loan Association). Eight counts were dismissed prior to trial. Of the eight counts tried, the jury convicted Thoreen of five. The convictions were of one count of fraud and four counts of conspiracy to defraud. Our discussion has five points: (1) issues answered summarily; (2) immunity for defense witness; (3) evidence of conspiracy; (4) statute of limitation; and (5) the number of conspiracies.

### Issues Answered Summarily

(a) Thoreen asserts the indictment should have been dismissed. His claim is that the general statutes under which the prosecutions were brought were inapplicable because a special statute applied. See *State v. Blevins*, 40 N.M. 367, 60 P.2d 208 (1936); *State v. Riley*, 82 N.M. 235, 478 P.2d 563 (Ct.App.1970). The special statute alleged to be applicable is the Banking Act; the specific section of the Banking Act alleged to be applicable is § 48–22–66, N.M. S.A. 1953 (Repl. Vol. 7). That section pertains to unlawful service as an officer or director of a bank. There is nothing indicating that any provision of the Banking Act applies to Thoreen, and no basis for holding that a specific statute prohibited the prosecutions under the general fraud and conspiracy statutes.

(b) Thoreen contends the indictment should have been dismissed because of irregularities in obtaining the indictment. This claim goes to the grand jury proceedings. There were two grand juries: the first investigated the demise of Great West; the second returned the indictment against Thoreen. The claim is that the proceedings in the first grand jury were tainted because of violation of statutes regulating grand jury proceedings. Assuming this is so, the stipulation of facts and *State v. Evans*, 89 N.M. 765, 557 P.2d 1114 (Ct.App.1976), dispose of the claim that proceedings before the second grand jury were tainted.

(c) Thoreen asserts the indictment should have been dismissed because of preindictment delay. At the time set for hearing on the motion, Thoreen had no evidence to present. He claims the hearing was only to determine whether an evidentiary hearing would be held on his motion. Be that as it may, Thoreen made a tender of what the evidence would show. That tender was insufficient to show a violation of due process by pre-indictment delay. *State v. Jojola*, 89 N.M. 489, 553 P.2d 1296 (Ct.App.1976).

(d) Defendant complains of the jury instructions on conspiracy. The instructions given were instructions approved by the Supreme Court. See U.J.I.Crim. 28.20 and 1.50. This Court is bound by the order approving the instructions. *State v. Scott*,

90 N.M. 256, 561 P.2d 1349 (Ct.App.1977). The fact that the approved instructions were used before their use became mandatory was not error because they fairly and correctly stated the applicable law. *State v. Valenzuela*, 90 N.M. 25, 559 P.2d 402 (1976).

(e) Additional issues listed in the docketing statement were not briefed. They were abandoned. *State v. Vogenthaler*, 89 N.M. 150, 548 P.2d 112 (Ct.App.1976).

*Immunity for Defense Witness*

The charges involved in the appeal were brought against Evans and Pirtle, as well as Thoreen. Prior to trial, Evans was granted immunity from prosecution pursuant to Rule of Crim.Proc. 58. Thereafter, Thoreen sought to have immunity from prosecution granted to Pirtle on the basis that Pirtle's testimony would exculpate Thoreen and that Pirtle would not testify unless granted immunity.

■■■ Rule of Crim.Proc. 58 purports to authorize the district court to grant a witness immunity from prosecution under the conditions stated in the rule. The rule was adopted by the Supreme Court. Its validity is questionable because: a) immunity from prosecution is qualitatively different from the privilege not to testify discussed in *Ammerman v. Hubbard Broadcasting, Inc.*, 89 N.M. 307, 551 P.2d 1354 (1976); and b) the granting of immunity from prosecution is a legislative function; neither a prosecutor nor a court may grant immunity absent express constitutional or statutory authority, *Apodaca v. Viramontes*, 53 N.M. 514, 212 P.2d 425, 13 A.L.R.2d 1427 (1949). This Court, however, has no authority to set aside a rule adopted by the Supreme Court. *Alexander v. Delgado*, 84 N.M. 717, 507 P.2d 778 (1973).

Thoreen does not challenge the validity of Rule of Crim.Proc. 58, nor does he assert that immunity to Evans was improperly granted. He does not claim he had a right to have immunity granted a purported defense witness, regardless of whether immunity was granted a prosecution witness. His claim is that once Evans was granted immunity, it was a violation of due process not to grant immunity to the purported defense witness, Pirtle. This is an argument that Thoreen was denied due process because of the manner that Rule of Crim. Proc. 58 was applied. The argument is based on the comment of then Circuit Judge Burger in footnote 1, *Earl v. United States*, 124 U.S.App.D.C. 77, 361 F.2d 531 (1966) and *United States v. Alessio*, 528 F.2d 1079 (9th Cir. 1976) which states: "[W]hatever power the government possesses [as to grants of immunity] may not be exercised in a manner which denies the defendant the due process guaranteed by the Fifth Amendment."

Under Rule of Crim.Proc. 58(a) the district court may grant immunity from prosecution only upon the application of the prosecuting attorney. Under Rule of Crim. Proc. 58(c) the prosecutor *may* apply for a grant of immunity if the witness is likely to refuse to testify on the basis of the privilege against self-incrimination and the testimony "may be necessary to the public interest".

Thoreen represented that Pirtle's testimony would be exculpatory of Thoreen. The trial court, and the prosecutor, wanted a showing that Pirtle's testimony would, in fact, be exculpatory. Thoreen states this requirement placed him "between a rock and a hard spot" because the only person who could make the showing was Pirtle, and Pirtle would not testify before being granted immunity. This argument overlooks what occurred in the trial court.

■■ The trial court suggested an *in camera* hearing; the prosecutor suggested an *in camera* hearing with the prosecutor excluded. Defendant did not respond to these suggestions. Not having taken advantage of the opportunity to explain to the court, outside of the prosecutor's presence, how Pirtle's testimony might be exculpatory and thus explain how a grant of immunity might be in the public interest, defendant is in no position to complain that due process was violated. Compare *United States v. Alessio*, supra, where information was pro-

vided to the court as to the testimony of the witness for whom immunity was sought. Here we have neither testimony nor tender as to the content of the asserted exculpatory evidence. See Evidence Rule 103. All we do have is speculation; such is an insufficient basis for holding due process was violated by the application of Rule of Crim. Proc. 58.

*Evidence of Conspiracy*

■ The conspiracy was to defraud. Fraud includes the intentional taking of anything of value which belongs to another by means of fraudulent conduct, practices or representations. Section 40A–16–6 N.M. S.A. 1953 (2d Repl. Vol. 6); *State v. McKay*, 79 N.M. 797, 450 P.2d 435 (Ct.App.1969); see U.J.I.Crim. 16.30. It is uncontradicted that a thing of value was taken from Great West—money. It is uncontradicted that the money was intentionally taken. It is uncontradicted that the money was taken by fraudulent conduct, practices and representations.

■ A conspiracy is a common design or agreement to accomplish an unlawful purpose or a lawful purpose by unlawful means. One cannot be a party to a conspiracy unless one knows of the conspiracy. *State v. Dressel*, 85 N.M. 450, 513 P.2d 187 (Ct.App.1973); *Morris v. Dodge Country, Inc.*, 85 N.M. 491, 513 P.2d 1273 (Ct.App. 1973). Defendant challenges the sufficiency of the evidence as to these two items. Specifically, defendant claims (a) the evidence does not show an agreement to defraud, and (b) if an agreement were shown, the evidence does not show that defendant was a knowing party to it.

■ To establish a common design, or agreement, there need not be proof that the alleged conspirators came together and actually agreed upon a method of operation to achieve an unlawful purpose or a lawful purpose by unlawful means; a mutually implied understanding is sufficient. *State v. Armijo*, 90 N.M. 12, 558 P.2d 1151 (Ct. App.1976); see *State v. Deaton*, 74 N.M. 87, 390 P.2d 966 (1964). This mutually implied understanding, and defendant's knowledge

and participation therein may be proved by circumstantial evidence. *State v. Deaton*, supra. Since the proof may be by circumstantial evidence, we disagree with defendant's contention that circumstantial proof should be disallowed if evidence is available, or potentially available, to directly prove the conspiracy.

■ The issue is whether there is substantial evidence to support the conspiracy convictions. *State v. Deaton*, supra. In determining whether the evidence is sufficient, we review the evidence in the light most favorable to support the verdicts. *State v. McCallum*, 87 N.M. 459, 535 P.2d 1085 (Ct.App.1975).

■ In deciding this issue, we must determine whether there was proof of a conspiracy involving a home mortgage loan and a conspiracy involving various construction mortgage loans. Both items involve Evans, who was president of Great West, Pirtle and Thoreen.

The initial business arrangements of Pirtle and Thoreen were as follows:

(a) Lucero was interested in setting up a mortgage company to assist Spanish-speaking persons obtain loans for homes. Pursuing this interest, Lucero had several discussions with Thoreen, an attorney. Thoreen introduced Lucero to Pirtle.

(b) On February 22, 1973 a certificate of incorporation was issued for Congress Mortgage Co., Inc. On the same day, a certificate of incorporation was issued for Congress Industries, Inc. Two of the original incorporators, of each corporation, were Pirtle and Lucero. Thoreen did the legal work in connection with these incorporations and was the attorney for the corporations.

(c) Zia Tile Co., Inc. had been incorporated in 1971. Lucero was one of the incorporators. Lucero had a contractor's license and did his contracting under the Zia name. In May, 1973 the corporate name was changed to Congress Construction Co., Inc. This name change was at the suggestion of Pirtle. Thoreen became the statutory agent for the construction company.

(d) Congress Industries was the "umbrella" corporation for Congress Mortgage and Congress Construction.

(e) At one bank there were three accounts for Congress Industries—general, payroll and operating. Pirtle and Thoreen were authorized signatures on each account. There was one bank account for Congress Mortgage; Pirtle and Thoreen were authorized signatures on this account. Pirtle was identified as president on all of these accounts. Thoreen was not identified by title on the Industries accounts; he was identified as secretary on the Mortgage account. At another bank, a payroll account for Congress Industries had authorized signatures of Pirtle as president and Thoreen as vice-president.

(f) A certificate of incorporation was issued for Southwest Fidelity Trust Company, Inc. (hereinafter, Fidelity) in October, 1971. Pirtle was one of the original incorporators and one of the original directors. By June, 1973 Thoreen was president of Fidelity.

Evans was the only loan officer for Great West. He handled all applications for loans, he approved the granting of loans, he made the site inspections, he approved disbursements in connection with the loans. The evidence is that Evans disbursed the loans at Pirtle's request.

(1) The Home Loan

Evans borrowed money from Great West to construct his home. In December, 1972 he entered a written agreement to sell the home to General American Leasing Company. This company was owned by Parsons, a borrower from Great West. The purchase price at this time was $69,500.00; approximately $12,000.00 in excess of Great West's loans to Evans. Pirtle, who had been introduced to Evans by Parsons, told Evans he wanted a loan to buy the home, that he wanted the home for an attorney who was to be his general counsel (Thoreen). Evans told Pirtle to "just apply". This loan discussion was in May, 1973.

On May 24, 1973 Pirtle and Congress Industries applied for a loan of $72,500.00.

No financial information was given in the application. On May 25, 1973 Pirtle and Evans appraised the home for $93,920.00; neither were "designated" appraisers. On May 28, 1973 Evans approved the loan. At the time the loan was approved, Evans had no financial information on Congress Industries; his only financial check on Pirtle was a telephone call, at Pirtle's suggestion, to a mortgage company in California.

A loan of $72,500.00 was made on June 4, 1973 to Congress Industries. Neither the note nor mortgage was signed by Pirtle individually. The note and mortgage were signed on behalf of Congress Industries by Pirtle as president and Thoreen as assistant secretary.

The various outstanding interests were paid off by the loan proceeds—Evans' construction loans from Great West, Evans' equity, Parsons' interest. In addition, $1,500.00 was disbursed to Congress Industries as "proceeds" on June 4, 1973. Another $217.84 was disbursed to Congress Industries on July 17, 1973.

Thoreen moved into the home and made the mortgage payments. He stopped these payments when Great West went into receivership in 1974. Fidelity (Thoreen was president) assumed the mortgage in August, 1973. A deed from Congress Industries to Fidelity, dated August 9, 1973, was recorded January 16, 1974. A second deed, dated October 23, 1973, was recorded on October 23, 1973.

The foregoing is substantial evidence of a mutually implied understanding by which Evans profited and Pirtle acquired cash for his corporation and a home for his attorney; by which neither Evans nor Pirtle undertook financial risks, and the hazard of loss was placed entirely on Great West. That this understanding was to be accomplished by fraudulent practice is not challenged.

The foregoing is substantial evidence that Thoreen was a party to the conspiracy. He signed the note and mortgage as assistant secretary of Congress Industries. He occupied the home. The property was then deeded to the corporation of which he was president.

### (2)   The Construction Loans

After the home loan was made, Pirtle discussed additional loans to finance housing construction. Evans told Pirtle the construction loans would be approved if Pirtle would buy eight lots that Evans owned. Evans had purchased these lots with money he borrowed from Great West while serving as Great West's president. The understanding between Evans and Pirtle was that there would be eight loans to construct houses for resale. Eight loans were made on the basis of appraisals made by Evans. The appraisals were of the estimated value of the completed house, plus the value of the lot. The loans made were 90 percent of that value. We find nothing showing an estimated cost of construction, and neither party suggests that construction costs were ever estimated.

Eight loan applications were made; all were approved the same day. The eight loans were in the names of three different borrowers. Different borrowers were necessary because of a banking regulation which prohibited Great West from loaning, to one borrower, more than ten percent of savings deposits or ten percent of the total sum of undivided profits, reserves and surplus, whichever was lower. Evans discussed the ten percent rule with Pirtle; Pirtle said he would avoid it. Four loans were applied for in the name of Anderson, three in the name of Congress Industries, and one in the name of Fidelity. The loans were made in accordance with the applications.

The loans were made without credit information about Congress Industries or Fidelity. Anderson did supply credit information; this will be discussed in the next paragraph. Evans made the loans without adequate credit information because he wanted to sell his lots. An early disbursement under each loan was payment to Evans for the lot involved.

The Anderson loans were a facade utilized to avoid the ten percent rule. Anderson had been working with Pirtle to set up a leasing company. Pirtle asked Anderson to sign a loan application; Pirtle explained that the credit of Congress Industries was stretched thin and additional credit worthiness was needed. Pirtle paid Anderson $1,000.00 for signing the loan application used to obtain the four Anderson loans. The check was on a Congress Industries account. The net worth shown on Anderson's loan application was overstated; Pirtle told Anderson to do so. Subsequently, Anderson was "released" from these loans; Anderson discussed the legal validity of this "release" with Thoreen.

The three loans to Congress Industries were signed for by Pirtle; the one loan to Fidelity was signed for by Thoreen.

Regardless of the named borrower, the builder of each of the eight houses was to be either Congress Construction or Congress Industries. This meant that Lucero's contractor's license, under the name of Congress Construction, was to be the license under which the houses were to be built. Lucero did not remain in this set up. About 90 days after changing the name of his company to Congress Construction, Lucero quit and took his license with him. This would have been in August or September, 1973. Lucero quit because of disagreements with Pirtle over control of construction and Lucero's belief that Pirtle had dissipated $25,000.00 which was to have gone to Congress Mortgage.

With Lucero's contractor's license unavailable, Congress Industries turned to Anjomi Construction Company. Anjomi had a contractor's license. Anjomi had been incorporated in 1972; DeMilio was one of its incorporators, stockholders and officers. Congress Industries acquired Anjomi in September, 1973; thereafter DeMilio, who had been vice-president, continued with Anjomi only as superintendent of construction. Anjomi had begun work on the eight houses in August, 1973.

In the discussions leading to the purchase of Anjomi by Congress Industries, DeMilio understood that Pirtle and Thoreen were the owners of Congress Industries. Thoreen was on the job sites, with Pirtle, at least once each week. According to DeMilio, Pirtle and Thoreen had the responsibili-

ty of paying the subcontractors; Thoreen would pay when Pirtle was out of town. This agrees with the evidence of authorized signatures on the bank accounts of Congress Industries. Once, Thoreen dictated a letter for Pirtle's signature; this letter discharged an electric company from further work on the construction.

DeMilio signed lien waivers in connection with the construction. He discovered that after he signed, someone typed information on the waiver indicating he was president of Anjomi. Disturbed, DeMilio questioned Thoreen who told DeMilio not to worry, that holding DeMilio out as president was a "mere" formality.

Upon the sale of Anjomi to Congress Industries, Anjomi closed its books and paid its taxes. After the sale, Thoreen tried to reopen Anjomi's old tax identification number.

By late September, Evans started getting telephone calls from suppliers complaining that they had not been paid. Pirtle assured Evans he would take care of these matters. Between September, 1973 and March, 1974, Evans did not know if the bills were being paid. Yet, during this period of time, Evans authorized disbursements under each of the loans for payment of bills. Most of these disbursements were to Congress Industries, the corporation whose bank accounts had Pirtle and Thoreen as authorized signatures.

By the end of 1973 none of the houses were completed and several of the loans were overdrawn. Evans spoke to Pirtle about the overdrafts; Pirtle asked for more money. Two things followed—increases in some of the original loans and some new loans.

Three of the original eight loans were overdrawn. The amounts of the other five were increased, without new appraisals to justify the loan and without the execution of new mortgage notes. One of the loan increases occurred in December, 1973; the other four occurred in February, 1974.

There were five new loans; the applications and approval of the loans occurred the same day, December 19, 1973. However, at least two of these loans could not be disbursed because Great West could not meet the liquidity requirement. Liquidity meant cash or government bonds easily convertible to cash. The liquidity required was six percent of total savings. Evans told Pirtle about the liquidity requirement.

To meet the liquidity requirement, Pirtle gave Evans a check for $300,000.00 and, at Pirtle's request, Evans made out a certificate of deposit for $300,000.00. This $300,000.00 was used in determining that the liquidity requirement was met; the loans were disbursed on December 24, 1973. The check bounced. The only purpose of the check was to increase liquidity and avoid the six percent rule.

The mortgages given in connection with the five new loans describe lots different from the lots covered by the original eight loans. While loan money was disbursed to pay for the lots named in the new loans, the disbursement for acquiring two of the lots was directly to Congress Industries. The new loans were made after Pirtle told Evans that money was needed to finish the houses being built with the original eight loans. Evans knew that money from at least two of the loans was to be used to finish construction of houses being built under the original eight loans.

The five new loans were to three named borrowers; this was necessary to avoid the ten percent, one borrower rule. Two of the new loans were to Fidelity, signed for by Thoreen. One was to Congress Industries, signed for by Pirtle. One was to Anjomi, signed for by Pirtle. One was to Anjomi, signed for by Kerekas. The evidence is conflicting as to Kerekas' position, but it is undisputed that Congress Industries owned Anjomi.

Anderson (the Anderson of four of the original eight loans) had signed various papers on the new loans. Anderson testified he signed various papers at the request of Thoreen and Pirtle, that he did as he was told and signed without reading the documents. Anderson also testified that most of the papers were signed in Thoreen's of-

fice with Thoreen's participation and Pirtle's presence. Thoreen was "talked to" anytime anything legal entered the picture. There is evidence that Congress' books were kept in a closet in Thoreen's office. Thoreen's office was in the Congress building, but separate from Congress' offices.

There is evidence that construction was never started in connection with the five new loans; there were no loan disbursements for construction costs for any of these five loans. However, for each of the five loans, there was a disbursement to Congress Industries for "Profit and Overhead".

By the spring of 1974 many claims of lien were being filed. On May 10, 1974 Great West was placed in receivership. That evening Thoreen told Pirtle to get his files out of town. That evening Thoreen asked Davis, a vice-president of Great West, to resign stating he would be of no assistance to the receiver and Thoreen would help Davis get a job anywhere he wanted.

The foregoing is substantial evidence of a mutually implied understanding that Congress Industries and Fidelity would acquire money from Great West through Evans; that the money, ostensibly received for construction of houses, would not be required to be put to that purpose, but disbursed as Congress Industries saw fit. That this understanding was to be accomplished by fraudulent practice is not challenged.

The foregoing is substantial evidence that Thoreen was a party to the conspiracy. He borrowed some of the money, he arranged or helped to arrange for Anderson's involvement, he attempted to use Anjomi's tax identification number, he was an authorized signature on the Congress bank accounts, he had physical possession of the Congress books, he was involved in anything legal.

There is substantial evidence to support the conspiracy convictions.

*Statute of Limitation*

The limitation issue involves the fraud conviction and one of the convictions for conspiracy to defraud. Both of these convictions are based on the home mortgage loan, identified as Great West loan 225. These convictions being, respectively, third and fourth degree felonies, the limitation period was three years. As stated in § 40A–1–8, N.M.S.A. 1953 (2d Repl. Vol. 6):

> No person shall hereafter be prosecuted, . . . unless the indictment shall be found or information or complaint filed therefor within the time hereinafter provided:
>
> &#42;   &#42;   &#42;   &#42;   &#42;   &#42;
>
> D. for a third or fourth degree felony, within three [3] years from the time the crime was committed[.]

The indictment was filed September 10, 1976. A criminal complaint charging the same offenses was filed August 10, 1976; however, a *nolle prosequi* of the complaint was entered after the indictment was filed. We do not consider whether the indictment was a continuation of the charges in the complaint for purposes of the statute of limitation because the one month period makes no difference to this issue.

Great West's last disbursement under loan 225 occurred on July 17, 1973 and was the $217.84 payment to Congress Industries referred to in the preceding issue in discussing the home loan.

If July 17, 1973 was the "time the crime was committed", see § 40A–1–8(D), supra, then the limitation period had expired before either the complaint or indictment was filed.

The State asserts the crimes cannot be considered as having been completed in July, 1973. There are two arguments.

The first argument is that Thoreen engaged in fraudulent conduct subsequent to July, 1973. This conduct involved dealings in connection with the home acquired by the loan. Thoreen lived in the home and made mortgage payments up to the time Great West was placed in receivership in May, 1974. Great West's records were changed to reflect the deed from Congress Industries to Fidelity; the changes in Great West's records occurred in November, 1973

and January, 1974. After Great West went into receivership, Thoreen leased the home and apparently collected some rent that should have gone to Great West.

■ Assuming, but not deciding, that the facts in the preceding paragraph can be considered as fraudulent conduct, none of it involves loan 225. The fraud, and the conspiracy, involved in loan 225 was in obtaining the loan in the first place. None of the facts in the preceding paragraph pertain to obtaining the money represented by the loan. Thoreen's conduct subsequent to July, 1973 was not conduct which went to obtaining the loan by fraud or by conspiracy to obtain the loan by fraud.

The second argument is that the fraud and the conspiracy to defraud in connection with loan 225 were continuing offenses. The claim is that the offenses continued so long as there were "overt acts" in connection with the offenses or so long as the criminal intent for the two crimes continued. This argument overlooks the definition of the crimes.

■ Fraud, as defined in § 40A–16–6, supra, is the misappropriating or taking of anything of value by fraudulent conduct, practices or representations. Once the misappropriation or taking occurs, and this occurrence is by means stated in the statute, the crime of fraud is complete. *State v. Weiler*, 338 S.W.2d 878 (Mo.1960); *Troup v. State*, 51 Okl.Cr. 438, 2 P.2d 591 (1931); see Annot., 10 A.L.R.3d 572, § 2 at page 573 (1966).

■ The conspiracy was to commit fraud in obtaining loan 225. Once the loan was obtained, that particular conspiracy ended. As stated in Annot., 62 A.L.R.2d 1369, § 2 at page 1372 (1958): "limitations against a prosecution for conspiracy run from the time the last overt act in furtherance of the conspiracy was committed." See *Grunewald v. United States*, 353 U.S. 391, 1 L.Ed.2d 931, 77 S.Ct. 963, 62 A.L.R.2d 1344 (1957).

The final "taking" under loan 225 occurred July 17, 1973. On that date the crime of fraud was completed and the crime of conspiracy to defraud was completed. No criminal prosecution having been instituted three years from that date, prosecution was barred under § 40A–1–8, supra. The fraud and conspiracy convictions in connection with loan 225 were barred.

*How Many Conspiracies?*

Defendant contends only one sentence may be imposed for conspiracy, claiming that only one conspiracy was proven. The State points out that there was more than one conspiracy; that the conspiracy in connection with loan 225, the home loan, was entirely unrelated to the conspiracies in connection with the construction loans. We agree with the State's contention, so far as it goes. However, it does not go far enough. There were three conspiracy convictions in connection with the construction loans. Was there more than one conspiracy in connection with these loans?

The three conspiracy convictions involving the construction loans were: (1) in connection with the loans to Anderson, (2) in connection with the loans to Congress Industries, and (3) in connection with the loans to Fidelity. The duration of these conspiracies, under the prosecution theory, was from February 1, 1973 to May 10, 1974. Thus, the State does not claim that there were separate conspiracies involving the original eight loans in August, 1973 and the five new loans in December, 1973.

The three named borrowers in connection with the eight original loans of August, 1973 were Anderson, Congress Industries and Fidelity. The reason for naming three borrowers for eight loans, arranged by Pirtle and Evans, was to evade the ten percent, one borrower rule.

The three named borrowers in connection with the five new loans of December, 1973 were Fidelity, Congress Industries and Anjomi. The reason for naming three borrowers for these five loans, again arranged by Pirtle and Evans, was to evade the ten percent, one borrower rule.

The thirteen loans, the increase in some of the loans, and the overdraft of other

loans were all part of the conspiracy to defraud Great West. The use of different named borrowers—Anderson, Congress Industries and Fidelity—was a part of the name façade employed by Pirtle and Thoreen in carrying out this conspiracy.

 The evidence does not show a separate conspiracy involving loans to Anderson, a separate conspiracy involving loans to Congress Industries, or a separate conspiracy involving loans to Fidelity. Rather, the evidence shows one conspiracy of which the use of different named borrowers was no more than a method of carrying out the scheme.

There being but one conspiracy in connection with the construction loans, only one sentence may be imposed for that conspiracy. *State v. Ross,* 86 N.M. 212, 521 P.2d 1161 (Ct.App.1974).

The convictions of fraud and conspiracy to defraud, in connection with loan 225, are reversed because the limitation period had run. The three convictions for conspiracy to defraud, all in connection with the construction loans were, under the evidence, convictions for one conspiracy. Only one sentence may be imposed for that conspiracy. The cause is remanded to the trial court to set aside the judgment and sentence and enter a new judgment convicting Thoreen of one count of conspiracy to defraud for which one sentence may be imposed.

IT IS SO ORDERED.

HENDLEY and LOPEZ, JJ., concur.