**Jesse Joseph TRUJILLO,
Petitioner-Appellant,**

v.

**George E. SULLIVAN, et al.,
Respondents-Appellees.**

**No. 85–2093.**

United States Court of Appeals,
Tenth Circuit.

April 1, 1987.

**600**

Peter Schoenburg, Asst. Federal Public Defender, Albuquerque, N.M., for petitioner-appellant.

Dale S. Morritz, Asst. Atty. Gen. (Paul Bardacke, Atty. Gen. for the State of New Mexico, with her on the brief), Santa Fe, N.M., for respondents-appellees.

Before McKAY, LOGAN and MOORE, Circuit Judges.

McKAY, Circuit Judge.

Jesse Trujillo appeals an order of the United States District Court for the District of New Mexico dismissing his petition for a writ of habeas corpus. Mr. Trujillo was convicted on two counts of first degree murder while imprisoned in the New Mexico State Penitentiary in the deaths of prisoner Bobby "Barbershop" Garcia and prison guard Louis Jewett. Though the State sought the death penalty, the jury could not unanimously agree to impose it. Instead, it sentenced Mr. Trujillo to two life terms and three years, to run consecutively to each other and to his previous life sentence.

## I.

The incident in question began on the catwalk of cellblock three of the New Mexico State Penitentiary where Officer Jewett heard an altercation erupt among three inmates: Jesse Trujillo, Ricky Garcia, and Bobby "Barbershop" Garcia (Barbershop). As Officer Jewett entered the catwalk, he observed Mr. Trujillo and Ricky Garcia holding shanks (prison knives) and fighting with Barbershop. The struggle moved into the guard station where Officer Jewett attempted to break up the fight and was stabbed, apparently by Ricky Garcia. Barbershop received multiple stab wounds and died shortly thereafter. Officer Jewett died approximately one month later from the injuries he sustained. Mr. Trujillo and Ricky Garcia were tried separately for the murders of Officer Jewett and Barbershop. At his trial, Mr. Trujillo relied on a theory of self-defense. His subsequent conviction was affirmed by the New Mexico Supreme Court. *State v. Trujillo*, 99 N.M. 251, 657 P.2d 107 (1982).

On this appeal, Mr. Trujillo raises ten points that he contends warrant issuance of a writ of habeas corpus. These same ten contentions were examined and rejected both by the New Mexico Supreme Court on direct appeal of his conviction and the district court in these habeas proceedings. We agree with these courts and affirm the dismissal of the petition for a writ.

## II.

Mr. Trujillo contends that the trial court erred in failing to instruct the jury on a lesser offense than first degree murder with respect to the death of Officer Jewett. This court has previously held that "failing to instruct the jury that it might convict the defendant of a lesser offense than first degree murder [is not] reversible on habeas corpus." *Poulson v. Turner*, 359 F.2d 588, 591 (10th Cir.), *cert. denied*, 385 U.S. 905, 87 S.Ct. 219, 17 L.Ed.2d 136 (1966). However, our decision in *Poulson* was made before the Supreme Court's opinion in *Beck v. Alabama*, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980). *Beck* makes clear that should our rule be read to apply when

the death sentence is imposed, it has been overruled.

In *Beck*, the Supreme Court held that Alabama's capital punishment statute was unconstitutional, because it prohibited the judge from instructing the jury on lesser included offenses when a defendant was charged with a capital crime. The jury had only two choices under the statute: conviction of the capital offense and imposition of the death penalty or total acquittal. The jury could not consider aggravating and mitigating circumstances or decide whether to forego the death sentence in favor of a life sentence without possibility of parole. Only the trial court considered such an alternative, and only after the jury had returned a guilty verdict with the requisite imposition of the death penalty.

The Supreme Court held that the death penalty could not be constitutionally imposed after a jury verdict of guilt of a capital offense when the jury was prohibited from considering a verdict of guilt of a lesser included noncapital offense and the evidence would have supported such a verdict. Thus, there is clearly now a constitutional right to a lesser included offense instruction when the death penalty is imposed and the evidence warrants the instruction.

The Court spoke loosely of capital and noncapital "cases" without giving any consideration to cases in which the death penalty is sought throughout the trial but not ultimately imposed even though a guilty verdict is entered—the very facts of the present case. The Court considered but explicitly declined to decide whether to extend its holding to clearly noncapital cases. *Id.* at 638 n. 14. 100 S.Ct. at 2390, n. 14. Nonetheless, in the course of its opinion, the Court stated: "While we have never held that a defendant is entitled to a lesser included offense instruction as a matter of due process, the nearly universal acceptance of the rule in both state and federal courts establishes the value to the defendant of this procedural safeguard." *Id.* at 637, 100 S.Ct. at 2389. The Court thereby left the door open to extend the constitutional right to a lesser offense instruction

further to even noncapital offenses. Whether the Court would recognize such a constitutional right turns in part on which constitutional provision it rested the *Beck* decision. Unfortunately, the Court's opinion is less than clear on this point.

On the one hand, the Court may have based its decision in a due process concept rooted in the eighth amendment prohibition against cruel and unusual punishment. In a case in which the death penalty is imposed, procedural safeguards and a higher degree of procedural exactitude are required that might not be constitutionally required in cases in which the death penalty is not imposed. The Court has repeatedly recognized the qualitative difference between capital and noncapital punishment and has strictly scrutinized the procedures under which the death sentence is imposed. If *Beck* is simply another in the line of cases since *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), delineating procedural safeguards to ensure that the death penalty is not imposed on the basis of caprice or emotion, then the case says little about the constitutional right to a lesser included offense instruction when the death penalty is not imposed.

On the other hand, the Court may have grounded its holding on a broader-based due process concept under the fifth and fourteenth amendments. Much of the opinion focuses on the right of an accused to a fair and impartial trial, which requires a factfinding process free of any impermissible extraneous influences on the trier of fact. Alabama's statutory scheme invited considerations other than evidence of guilt of the crime charged to impact on the guilt-determining process. This "all-or-nothing" option created the possibility that if

> the evidence unquestionably establishes that the defendant is guilty of a serious, violent offense—but leaves some doubt with respect to an element that would justify conviction of a capital offense—the failure to give the jury the "third option" of convicting on a lesser included offense would seem inevitably to enhance the risk of an unwarranted conviction.

*Beck,* 447 U.S. at 637, 100 S.Ct. at 2389. Alternatively, under the all-or-nothing scheme a jury might "be more likely to acquit than to convict whenever it has anything approaching reasonable doubt." *Id.* at 639, 100 S.Ct. at 2390. Either way, considerations other than the evidence presented at trial might affect the guilt determination under the Alabama statute. The increased risk of error in the factfinding process because of a failure to give a "third option" violates fundamental fairness.

In the final analysis the difficulty with the Alabama statute is that it interjects irrelevant considerations into the factfinding process, diverting the jury's attention from the central issue of whether the State has satisfied its burden of proving beyond a reasonable doubt that the defendant is guilty of a capital crime.

*Id.* at 642, 100 S.Ct. at 2392.

The same concern for reliability of the factfinding process when no "third option" is provided also arises in the case in which the death penalty is not imposed. If this aspect of the opinion is paramount, then a constitutional, due process violation would necessarily be found in a habeas proceeding if a trial court erroneously refused to give a lesser offense instruction warranted by the evidence. For a very thoughtful law review note espousing just such a view, see Note, *Beck v. Alabama: The Right to a Lesser Included Offense Instruction in Capital Cases,* 1981 Wis.L.Rev. 560.

In the six years since *Beck,* the Supreme Court has declined to consider whether *Beck* should be extended to noncapital cases. *See, e.g., Holloway v. Florida,* 362 So.2d 333 (Fla.Dist.Ct.App.1978), *cert. denied,* 449 U.S. 905, 101 S.Ct. 281, 66 L.Ed.2d 137 (1980) (Blackmun, Brennan, and Marshall, JJ., dissenting). Neither has it decided whether there is a constitutional right to a lesser included offense instruction warranted by the evidence in a case such as this, in which the death penalty is sought but ultimately not imposed. Analytically, the capital case in which the death penalty is not ultimately imposed appears to be more like the noncapital case than the death sentence case in which eighth amendment values are clearly implicated; unless the defendant is actually sentenced to death, the eighth amendment is not directly implicated. This case, therefore, belongs with noncapital cases merely because of the fortuity that the death penalty was not in fact imposed.[1]

Although we did not have this particular set of facts in mind in *Poulson,* our rule was broadly stated and appears to automatically foreclose habeas review of the failure to instruct on a lesser offense in all non-death sentence cases. This position is consonant with the widely held view that failure of a state court to instruct on a lesser offense fails to present a federal constitutional question and so does not merit federal habeas corpus review. In addition to this circuit, the Fifth, Eighth and Ninth Circuits all explicitly adopt this position. *See, e.g., Easter v. Estelle,* 609 F.2d 756, 758 (5th Cir.1980); *James v. Reese,* 546 F.2d 325, 327 (9th Cir.1976); *DeBerry v. Wolff,* 513 F.2d 1336, 1339 (8th Cir.1975). *But see Ferrazza v. Mintzes,* 735 F.2d 967, 968 (6th Cir.1984) (the *Beck* principle that due process requires the court to give a lesser included offense instruction when warranted by the evidence is not limited to capital cases).

The theory underlying this automatic bar to habeas review has not been well articulated. In *Hill v. United States,* 368 U.S. 424, 82 S.Ct. 468, 7 L.Ed.2d 417 (1962), the Supreme Court examined the character or magnitude of an error in considering whether it is cognizable under a writ of habeas corpus. The Court there held that an error not amounting to "a fundamental defect which inherently results in a complete miscarriage of justice, nor an omission inconsistent with the rudimentary de-

---

**1.** Since *Beck,* the State gambles when it both seeks the death penalty and yet opposes a lesser included offense instruction arguably warranted by the evidence. If the instruction is not given and the State succeeds in its quest for the death penalty, the defendant is automatically entitled to a new trial under *Beck* if the evidence is later held to have been sufficient to support a lesser offense instruction.

mands of fair procedure" could not be considered in a habeas proceeding. *Id.* at 428, 82 S.Ct. at 471. *Hill* appears to say that a "due process like" analysis of the facts of a case is required to determine whether a claimed error can be addressed under a writ. However, the majority of post-*Hill* circuit cases, including our own Tenth Circuit *Poulson* precedent, seems to have implicitly applied *Hill* and concluded that the failure to instruct on a lesser included offense when the evidence warrants such an instruction *never* constitutes a "fundamental defect" of the type described in *Hill.*

Because the Supreme Court in *Beck* expressly declined to decide whether there is a due process right to a lesser included offense instruction in noncapital cases, *Hill* could not have stood for the proposition that a failure to instruct never violates due process and thus is never cognizable in a habeas proceeding. The *Beck* Court would not have left the question open if it had believed it was foreclosed by a generic application of *Hill.* Therefore, *Hill* seems to require a due-process look at the facts of each case so as to determine whether the failure to instruct is sufficiently egregious to warrant habeas relief. *Beck* only leaves open the question whether habeas relief should be *automatically* accorded when a trial court fails to instruct on a lesser included offense warranted by the evidence because a due process right to such an instruction exists.

Neither the Sixth nor the Seventh Circuit has adopted an automatic nonreviewability rule. The Sixth Circuit has summarily held in a habeas case that the *Beck* principle—that due process requires a lesser included offense instruction be given if warranted by the evidence—is not limited to capital cases. *Ferrazza,* 735 F.2d at 967. However, the court failed to articulate the analysis underlying its substantive decision to extend the constitutional reach of *Beck,* a decision which makes such claims cognizable on habeas review.

In *United States ex rel. Peery v. Sielaff,* 615 F.2d 402 (7th Cir.1979), *cert. denied,* 446 U.S. 940, 100 S.Ct. 2163, 64 L.Ed.2d 794 (1980), the Seventh Circuit first appeared to adopt the general rule of automatic nonreviewability in a habeas proceeding, quoting the Ninth Circuit case of *James v. Reese* for that very proposition. Nevertheless, the court then proceeded to review the specific facts of the case in order to determine whether there was a complete miscarriage of justice under *Hill.* After examining the record, the court held that denial of a voluntary manslaughter instruction did not violate due process in that case, because "the evidence of serious provocation was not so unequivocally strong that failure to give the instruction could be said to have amounted to a fundamental miscarriage of justice." *Peery,* 615 F.2d at 404. Thus, the Seventh Circuit, while at first appearing to recognize the general rule of automatic nonreviewability in a habeas proceeding, will examine the specific facts of a case under the very *Hill* test that seems to have prompted the Fifth, Eighth, Ninth, and Tenth Circuit rule of automatic nonreviewability in *all* cases of failing to instruct on lesser offenses.

In light of *Beck*'s analysis, the Seventh Circuit's approach of applying *Hill* to each case appears to comport more easily with *Beck* and *Hill,* when read together, than does the automatic nonreviewability rule of this and other circuits. Unlike the automatic nonreviewability rule, the Seventh Circuit approach contemplates that there may be times when the evidence so overwhelmingly supports a lesser included offense instruction that refusing to instruct on the lesser offense constitutionally taints, under *Hill,* the process by which the defendant is found guilty of the greater offense, whether or not *Beck* is extended to recognize an automatic right to a warranted lesser offense instruction.

The Seventh Circuit has considered the impact of *Beck* on its reviewability rule in habeas proceedings. In *Nichols v. Gagnon,* 710 F.2d 1267 (7th Cir.1983), *cert. denied,* 466 U.S. 940, 104 S.Ct. 1918, 80 L.Ed.2d 465 (1984), Judge Posner, writing for the panel, examined whether *Peery* survived *Beck* or whether *Beck* should be extended to noncapital cases, so that failure to instruct on a lesser offense when the

evidence warrants the instruction *always* requires habeas relief because defendant's constitutional right to the instruction was violated. The court affirmed its *Peery* position, declining to so extend *Beck.*

■ Fairly read, the defendant's brief in this case asks us to consider, as did the Seventh Circuit, whether *Beck* should be extended to cases in which the death penalty is not imposed. Were we to hold that the defendant's constitutional rights were violated by the trial court's refusal to instruct on the lesser included offense, even though the death penalty was not imposed, we would be concluding that the constitutional foundation for *Beck* rests in the due process clause rather than the eighth amendment. Because of our prior precedent in *Poulson,* we cannot so hold without *en banc* consideration of the issue. However, this issue was not specifically argued and no reading of the record remotely suggests[2] that *Hill* was violated. Thus, even were we to employ the Seventh Circuit approach rather than merely invoke our automatic nonreviewability rule, this panel does not find it necessary to request *en banc* consideration of *Poulson*'s broad holding.

### III.

Mr. Trujillo's chief contention on appeal is that the means used by the trial judge to voir dire the jury panel denied the defendant his right to due process and a representative, fair, and impartial jury under the sixth and fourteenth amendments. Specifically, Mr. Trujillo raises four points in this regard.

His first contention, that the court cannot constitutionally exclude from the guilt phase of a capital trial those venirepersons who would refuse to consider imposing the death penalty, has been foreclosed by *Lockhart v. McCree,* — U.S. —, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986), *rev'g Grigsby v. Mabry,* 758 F.2d 226 (8th Cir. 1985) (en banc).

Second, Mr. Trujillo maintains that the trial court's failure to conduct the "death-qualification" process in an individual and sequestered setting violated his rights to due process and to an impartial jury. Mr. Trujillo had timely moved for individual voir dire, and that motion was denied. Order, record, supp. vol. 2, at 286. Although *Lockhart* approved the use of death-qualified juries in the innocence-guilt portion of a capital trial, it did not scrutinize the manner in which such qualification can constitutionally occur. Thus, we must examine whether the death qualification process itself implemented by the trial court in this case denied Mr. Trujillo his right to a fair and impartial jury.

The State asserts that we need not further examine the death qualification process, because Mr. Trujillo was not sentenced to death, citing several cases:

---

2. The record supports a finding that there was no fundamental miscarriage of justice because of the failure to instruct on voluntary manslaughter with respect to Officer Jewett's death, even though as an initial matter the evidence might have been sufficient to support such an instruction. Only the prosecution presented evidence regarding the stabbing death of Officer Jewett. That evidence indicated that at one point during the scuffle, Officer Jewett grabbed Mr. Trujillo from behind to stop his assault on another officer. At this point, Mr. Trujillo's codefendant interrupted his assault on Barbershop to knife Officer Jewett in the back, breaking the officer's hold on Mr. Trujillo. Mr. Trujillo then turned around and made several stabbing motions toward Officer Jewett. Two witnesses testified that Officer Jewett's body reacted to these motions as if being struck, although neither could testify that he actually saw Mr. Trujillo stab Officer Jewett.

The court instructed the jury as to first degree murder both under intentional and felony murder theories, as well as under an accessory theory (with Mr. Trujillo as an accessory to his codefendant's deliberate assault on Officer Jewett). The only bases Mr. Trujillo advances to support second degree murder and voluntary manslaughter instructions are Mr. Trujillo's later statement that he did not mean to "get the guard" and the short amount of time within which all the events transpired. Appellant's Brief in Chief at 45. Because the evidence supporting these lesser included offense instructions is not "unequivocally strong," *Peery,* 615 F.2d at 404, failure to give the instructions did not amount to a fundamental miscarriage of justice and thus is not redressable in a habeas proceeding under the Seventh Circuit rule. *Cf. Ferrazzo,* 735 F.2d at 968.

*Bumper v. North Carolina*, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968); *Brinlee v. Crisp*, 608 F.2d 839 (10th Cir.1979), *cert. denied*, 444 U.S. 1047, 100 S.Ct. 737, 62 L.Ed.2d 733 (1980); *Redford v. Smith*, 543 F.2d 726 (10th Cir.1976); *Sinclair v. Turner*, 447 F.2d 1158 (10th Cir.1971), *cert. denied*, 405 U.S. 1048, 92 S.Ct. 1329, 31 L.Ed.2d 590 (1972). However, at best those cases hold only that one who does not receive the sentence of death cannot seek habeas corpus relief based upon the *exclusion* of those potential jurors unwilling to impose the death penalty.

Under this point of appeal, Mr. Trujillo does not challenge the exclusion of jurors; rather, he is concerned with the effect that the death qualification process had on the *remaining* jurors who ultimately found him guilty. He argues, in essence, that the very procedure of immediately quizzing potential jurors on their views regarding the death penalty sends an implicit message that the defendant must, in fact, be guilty, else "the judge and the lawyers would not go through all the trouble of discussing what the punishment might be." Appellant's Brief in Chief at 23. Mr. Trujillo argues, whether the death penalty is imposed or not, that the "process itself encourages a juror to presume the defendant's guilt." *Id.* at 24.[3]

This contention is quite different from the one forwarded in the cases cited above, and those cases do not foreclose our consideration in this habeas proceeding of the constitutionality of the manner in which death qualification occurred. Moreover, the Supreme Court in *Lockhart* did not consider itself precluded from examining whether the exclusion from the guilt-innocence phase of those potential jurors irrevocably opposed to the death penalty was constitutional, even though the defendant in that case received only a life sentence and even though the proceeding was one for habeas corpus relief.

In this case, the voir dire with respect to death qualification was conducted exclusively by the trial court in panels of five potential jurors. Each panel was first asked the same two questions:

1. Are there any of you who have moral or ethical or conscientious or religious scruples against the imposition of the death penalty?

. . . .

2. . . . Without determining upon what basis of [sic] for what reason, are there any of you who are against the imposition of the death penalty?

State Court Transcript, record, vol. 1, at 99. Anyone who answered either of these affirmatively were then asked individually, but in the presence of the other four panel members, four additional questions:

3. Do you feel that your attitude against the death penalty would have a tendency to influence you against a finding of murder in the first degree, even though you were convinced under the evidence and the instructions that the defendant was guilty of murder in the first degree beyond a reasonable doubt?

. . . .

4. Do you believe that your feelings and attitude against the imposition of the death penalty would cause you to vote against a finding of first degree murder, even though you were convinced beyond a reasonable doubt that the crime committed was murder in the first degree?

. . . .

5. If you find the defendant guilty of murder in the first degree would you, regardless of the facts and circumstances which may be presented by the evidence during the trial and the sentencing proceeding, automatically refuse to vote for the sentence of death?

. . . .

6. Are you irrevocably committed at this time to vote against the death penalty regardless of the facts and circumstances that might emerge in the course of the proceedings?

*Id.*, vol. 1, at 100–01.

Only those answering the sixth question affirmatively were excused for cause.

---

**3.** For an expansive discussion of this argument, see *Hovey v. Superior Court*, 28 Cal.3d 1, 616 P.2d 1301, 1347–55, 168 Cal.Rptr. 128, 174–82 (1980).

State Court Transcript, record, vol. 1, at 99–101, 116–18, 147–48, 155–57, 161–63, 174–77, 182–84, 188–89. Those answering any of questions one through five affirmatively, but yet who were not "irrevocably committed" to vote against the death penalty regardless of the attendant facts and circumstances, were retained on the panel.[4]

Mr. Trujillo, in effect, maintains that individual and sequestered voir dire regarding death qualification is constitutionally required and that the death qualification by five-member panels in this case demands that we grant habeas corpus relief.

■ One other circuit has specifically examined whether individual voir dire regarding death qualification is constitutionally required. In *McCorquodale v. Balkcom*, 721 F.2d 1493, 1495–96 (11th Cir.1983), the entire jury pool of sixty potential jurors was voir dired at once regarding death qualification. The Eleventh Circuit held that group questioning did not constitute a per se violation of *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). On the other hand, after examining a study detailing the detrimental effect that the death-qualification process may have on a juror's tendency to find guilt, the California Supreme Court ordered that death-qualifying voir dire must be individual and sequestered.

The most practical and effective procedure available to minimize the untoward effects of death-qualification is individualized sequestered voir dire. Because jurors would then witness only a single death-qualifying voir dire—their own— each individual juror would be exposed to considerably less discussion and questioning about the various aspects of the penalty phase before hearing any evidence of guilt. Such a reduction in the pretrial emphasis on penalty should minimize the tendency of a death-qualified jury to presume guilt and expect conviction.

*Hovey*, 616 P.2d at 1353, 168 Cal.Rptr. at 180. The Court, however, prescribed the rule "pursuant to its supervisory authority over California criminal procedure." *Id.* at 1354, 168 Cal.Rptr. at 181. It did not rely on either the California or United States Constitution. We agree that individual and sequestered death-qualifying voir dire is not constitutionally dictated.

While the trial court has broad discretion in conducting voir dire, we do not blithely affirm the death-qualification process used by the trial court here. This broad discretion is "limited by the requirements of due process." *United States v. Hawkins*, 658 F.2d 279, 283 (5th Cir.1981). Although every criminal trial must conform to constitutional standards, our scrutiny in capital tri-

---

**4.** Mr. Trujillo claims that "[a]ny juror who answered [affirmatively] to the third, fourth, fifth or sixth questions was summarily excused, over defense objections." Appellant's Brief in Chief at 8. However, a careful reading of the record shows that, in compliance with *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), only those answering question six affirmatively were so excused. *Witherspoon* held that venirepersons who voiced only general objections to the death penalty or conscientious or religious scruples against its imposition could not be constitutionally excluded from the jury for cause. *Id.* at 522, 88 S.Ct. at 1777. Several panel members answering affirmatively to any of questions three, four, or five were nevertheless retained because they responded to the determinative question, number six, negatively. *See, e.g.,* state court transcript, record, vol. 1, at 111–14, 140–46. This comports with the standard enunciated in *Adams v. Texas*, 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980), and affirmed in *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841

(1985), that a prospective juror in a capital case may be excluded for cause only when his views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." In fact, counsel for the defense admitted as much in a colloquy with the court:

Mr. Wagman: ... And the Court has summarily excused all jurors who have voiced scruples against giving the death penalty.
The Court: Oh no. That is not the case. There are some who have scruples against it who said they were not irrevocably committed against it, who are still on the panel. That was the Court's ruling.
Mr. Wagman: Yes.
The Court: Only those were excused who were irrevocably committed against the death penalty.
Mr. Wagman: Yes. The Court excused all of those prospective jurors irrevocably committed against the death penalty.
State court transcript, record, vol. 1, at 288–89.

als must be particularly sensitive. Capital trials are unique and ponderous occurrences, distinct from any other exercise of state power. When the machinery of the state seeks to extinguish a life, we must especially ensure that the process employed to accomplish that end complies with the defendant's right to a fair trial by an impartial jury.

■ An exercise of discretion to deny sequestered voir dire in a civil trial or non-capital criminal trial may comport quite easily with due process under the specific circumstances, whereas that same exercise of discretion may offend notions of fairness in the context of a capital trial. There may be a case where *en masse* death-qualifying voir dire may be so egregious and may so taint the jury that the process denies the defendant his constitutional right to an impartial jury. We simply conclude, after a careful review of the record, that the death-qualifying voir dire in panels of five complied with the dictates of due process.

Mr. Trujillo's third challenge to the voir dire in this case is that the exclusively court-conducted, death-qualifying voir dire violated his rights to due process and to a fair and impartial jury. Although the court allowed counsel to participate in the general voir dire, the court elected to exclusively conduct the death-qualification portion itself, as previously described. It also declined to give a proposed instruction submitted by Mr. Trujillo regarding a prospective juror's duty "to consider" imposing the death penalty—the court believing, and we agree, that the instruction was inherent in the questions asked. State transcript, record, vol. 1, at 47–48. Moreover, the court refused to allow counsel to attempt

to "rehabilitate" those who professed to be "irrevocably committed" against the death penalty. *Id.* at 102–06.

■ We find no constitutional violation in the trial court's choice to exclusively conduct the death-qualifying portion of the voir dire. *See United States v. Ainesworth,* 716 F.2d 769, 770 (10th Cir.1983). We are satisfied that the means employed by the trial court to test the impartiality of the potential jurors created a reasonable assurance that prejudice would have been discovered if present. *United States v. Saimiento-Rozo,* 676 F.2d 146, 148 (5th Cir.1982).[5]

The six precise questions asked by the trial court of small groups of five struck an adroit and delicate balance between the two antagonistic concerns at stake. The questions were sufficient to identify those who, under the dictates of *Witherspoon* and *Witt,* should be excused for cause because unable to abide by his or her oath as a juror and apply the law of the state. Yet, at the same time, the circumscribed voir dire minimized the potential pernicious effects identified by Dr. Haney. *See supra* note 5. Mr. Trujillo is entitled to no more. After all, "the purpose of the voir dire is to ascertain disqualifications, not to afford individual analysis in depth to permit a party to choose a jury that fits into some mold that he believes appropriate for his case." *United States v. Barnes,* 604 F.2d 121, 138 (2d Cir.1979) (quoting *Schlinsky v. United States,* 379 F.2d 735, 738 (1st Cir.), *cert. denied,* 389 U.S. 920, 88 S.Ct. 236, 19 L.Ed.2d 265 (1967)), *cert. denied,* 446 U.S. 907, 100 S.Ct. 1833, 64 L.Ed.2d 260 (1980).

Finally, Mr. Trujillo challenges the trial court's refusal to allow any inquiries of the

---

5. In fact, we find an incongruence between Mr. Trujillo's request for extensive questioning regarding death qualification, including attempts to rehabilitate those who unambiguously voice "irrevocable" opposition to it, and the feared deleterious effects that repetitive and intense death-qualifying voir dire can purportedly have on a potential juror's tendency to find guilt. *See supra.* Mr. Trujillo's own brief cites and discusses a 1979 study conducted by Dr. Craig Haney, an assistant professor of psychology at the University of California at Santa Cruz, which concluded that the death-qualification

process itself increases a juror's tendency to find guilt. *See* Haney, *On the Selection of Capital Juries: The Biasing Effects of the Death Qualification Process,* 8 L. & Hum.Behav. 121 (1984). Dr. Haney found that the prejudicial alteration in attitudes resulting from death-qualifying voir dire is a direct function of how extensive the questioning becomes. "[T]he extent to which [these effects] are minimal will be a function of the extent to which the questioning is minimized." *Hovey,* 616 P.2d at 1353, 168 Cal.Rptr. at 180 (quoting testimony from Dr. Haney).

jury panel by defense counsel concerning the New Mexico Penitentiary Riot of 1980. The court originally ruled that it would prohibit any voir dire regarding the 1980 riot, although it did agree to advise the jurors that this was not a riot-related case. State transcript, record, vol. 1, at 245. However, in light of an article about the riots and trials emanating from it that was published in the *New Mexican* after the voir dire regarding pre-trial publicity was completed, the court agreed to conduct additional voir dire itself. *Id.* at 247. During this additional questioning, the court went beyond the article and did, in fact, question the prospective jurors specifically about the riot:

> The Court: ... More specifically, how many of you have read, seen or heard through the media accounts of the riot at the New Mexico State Penitentiary that occurred on February 2nd or 3rd of 1980, last year? [After several affirmative responses, the Court continued]: Did anything any of you read about the events at the penitentiary on those dates and will it impair your ability to sit as fair and impartial jurors in this trial; if so, please raise your hands?
>
> (No response.)
>
> The events alleged in the indictment in this case are dated February 26th, 1981, this year, more than a year after the riot. If selected as jurors can you put out of your mind anything that you may have seen, read or heard about the conditions and events in the penitentiary, including February 2nd and 3rd of 1980, and decide this case solely and entirely upon the evidence presented in open court, applying to that the Court's instructions as to the law applicable to that evidence; can each of you do that, and will you do that?
>
> (All indicate affirmatively.)

*Id.*, vol. 1, at 273–74.

■ The inquiry made by the court was adequate to reveal either any possible prejudice from a mistaken assumption that this case was related to the 1980 riot or any inability to act impartially notwithstanding knowledge of the penitentiary riot events. In fact, any further probing "might actual-ly have been prejudicial to [the defendant,]" *United States v. Robinson,* 546 F.2d 309, 312 (9th Cir.1976), *cert. denied,* 430 U.S. 918, 97 S.Ct. 1333, 51 L.Ed.2d 597 (1977), by stressing an event with minimal, if any, relevance to the case at hand.

### IV.

Mr. Trujillo's third contention in this appeal is that the trial court's refusal to question, or to allow counsel to question, an excused juror violated his right to an impartial jury. One of the potential jurors in this case had served on the grand jury that indicted Mr. Trujillo and was therefore excused for cause. However, prior to her excusal, she had been sequestered in the courthouse along with the rest of the jury panel over several days. Although the judge admonished the potential jurors not to discuss the case among themselves, Mr. Trujillo claims to have "good reason to believe that she discussed the case with other venirepersons." Appellant's Brief in Chief at 29. He does not elaborate further on the foundation for this belief.

Defense counsel do not object to her excusal, but they do object to being deprived of the opportunity prior to her excusal to interrogate her as to whether she discussed the grand jury proceedings with other panel members. In denying counsel's motion to question the excused juror, the court stated that they could question the remaining jurors during the general voir dire regarding any conversations that may have transpired with the excused juror. State transcript, record, vol. 1, at 207. Defense counsel chose not to so question the remaining panel members.

■ We hold that the trial court's denial of counsel's motion to question the excused juror did not violate defendant's constitutional rights. Mr. Trujillo is entitled to have the opportunity to uncover any possible prejudice that would blemish a potential juror's impartiality. However, he is not entitled as a matter of constitutional law to choose the particular, possibly most efficient, means of uncovering any such prejudice. Counsel had the opportunity to question the remaining panel members and

failed to do so. The argument that such a plenary voir dire would unnecessarily stress the importance of the grand jury finding of probable cause is frivolous. Counsel could have easily questioned the remaining panel members as to any conversations had with the excused juror without discussing details regarding the grand jury findings.

### V.

Mr. Trujillo's fourth point on appeal deals with the voir dire and excusal of a potential juror whose brother was charged with forgery and fraud. Although the potential juror stated that she could be a fair and impartial juror, *id.*, vol. 1, at 349–59, the State requested further, sequestered questioning regarding her ability to remain impartial. Specifically, the State was concerned that the juror might feel compelled to vote not guilty in spite of the evidence because of fear of retaliation against her brother should he be sent to the penitentiary.

The court conducted further voir dire outside the presence of the other jurors. Because Mr. Trujillo characterizes this questioning as "intimidation," we set out pertinent portions in the margin.[6]

A finding of juror partiality is one of fact entitled to a presumption of correctness under 28 U.S.C. § 2254(d) (1982). *Wainwright v. Witt,* 469 U.S. 412, 426, 105 S.Ct. 844, 853, 83 L.Ed.2d 841 (1985); *Patton v. Yount,* 467 U.S. 1025, 1036–38, 104 S.Ct. 2885, 2891–92, 81 L.Ed.2d 847 (1984). We agree with the district court that the trial court acted within the legitimate bounds of discretion in questioning the juror and that the decision to excuse her for cause had fair support in the record.

Mr. Trujillo states that he "does not necessarily challenge the court's ultimate decision that [the potential juror] was partial at the conclusion of her interrogation but rather [he] contests the provision of questionable 'information' which rendered her excusable." Appellant's Brief in Chief at 31. In other words, we are confronted with the unusual contention that the court's voir dire was *too* searching—that as soon as the juror stated she would be impartial, any further questioning resulting in her disqualification constitutes a violation of Mr. Trujillo's right to an impartial jury. (The much more common contention we usually face is that a voir dire was unconstitutionally constricted.) We do not think the record supports this contention.

"In its entirety, the examination must reveal inquiry adequate 'to call to the attention *of the veniremen* those important

---

6. The Court: If he is found guilty it could result in his being sent to the New Mexico State Penitentiary, do you understand that?
[Juror]: Yes, I do.
The Court: If that should occur would you have any fear about his safety at the penitentiary?
[Juror]: Well—
The Court: Now, let me ask you specifically. If you are selected as a juror in this case and he should go to the penitentiary, do you feel that the other inmates might retaliate against him because of your effect as a juror here, possibly?
[Juror]: I don't see how they would know.
The Court: Well, believe me—
[Juror]: They would.
The Court: —there is a chance that most information that is known gets to the penitentiary and travels throughout the penitentiary; they would know, in my opinion.
[Juror]: Well, if it were to bring harm to him I would rather not.
The Court: Do you feel that the possibility of harm might be brought to him if you serve as a juror in this case and that it might influence your verdict as a juror in this case?
[Juror]: I don't think it would influence my verdict.
The Court: What may happen to him if he goes to the penitentiary would not enter your mind at all if you serve as a juror in this case, and would not prevent you from voting either guilty or not guilty, as you feel you should based on the evidence and the Court's instructions, is that correct?
[Juror]: Right.
The Court: You don't feel it will affect you in the least?
[Juror]: Well, I don't want any harm brought to him.
The Court: Of course, we understand that. We understand that. But I am asking if the possibility that harm could occur to him if he goes to the penitentiary, if that possibility would impair your juror service here in this case?
[Juror]: I really don't think so.
The Court: You don't think so.
State transcript, record, vol. 1, at 361–63.

matters that might *lead them to recognize or to display their disqualifying attributes.'"* *Fietzer v. Ford Motor Co.*, 622 F.2d 281, 285 (7th Cir.1980) (quoting *United States v. Lewin*, 467 F.2d 1132, 1138 (7th Cir.1972)) (emphasis added). One essential purpose of voir dire is to "effectively alert the potential jurors to examine [any] possible prejudice...." *Beard v. Mitchell*, 604 F.2d 485, 501 (7th Cir.1979). The trial court did not impinge on defendant's constitutional rights in probing further the consequences that the potential juror's brother might face and her consequent ability to remain impartial.

■ Mr. Trujillo analogizes the court's questioning in this case to the impermissible duress imposed by the court in *Webb v. Texas*, 409 U.S. 95, 93 S.Ct. 351, 34 L.Ed.2d 330 (1972) (per curiam). The analogy is imperfect. In *Webb*, a defendant's sole prospective witness exercised his fifth amendment rights and refused to testify only after the trial court threatened and harassed the witness, essentially coercing him into not testifying.[7] The Supreme Court found that the trial court precluded the witness from "making a free and voluntary choice whether or not to testify." *Id.* at 98, 93 S.Ct. at 353. Unlike the decision to testify, however, the decision whether someone will serve as a juror is not made by the potential juror. In this case, the court merely ensured that the panelist had sufficient information on which to render an opinion as to her ability to remain impartial.

## VI.

Mr. Trujillo's next contention is that his right to a representative, fair, and impartial jury was violated by the court's denial of his request to quash the jury panel or, alternatively, to continue the trial to afford him the opportunity to gather statistical evidence demonstrating a failure to meet the "fair-cross-section requirement." He maintains that an excessive number of persons involved in, or related to persons involved in, law enforcement were included on the jury panel from which the jurors were selected. He claims that a statistical analysis would show the over-inclusion of persons with some connection to law enforcement and that the court violated his constitutional rights in denying him a continuance to compile such evidence. However, such a showing would not in itself be sufficient to establish a prima facie violation of the fair-cross-section requirement.

In addition to showing that a distinctive group's representation in a jury panel is not fair and reasonable in relation to the number of such persons in the community, as a statistical analysis may have demonstrated in this case, Mr. Trujillo must also have established that the under- or over-representation resulted from systematic exclusion or inclusion of the group in the jury-selection process itself. *Duren v. Missouri*, 439 U.S. 357, 364–67, 99 S.Ct. 664, 668–70, 58 L.Ed.2d 579 (1979). The trial court correctly recognized Mr. Trujillo's burden of establishing some corruption in the process itself, state transcript, record, vol. 1, at 55, such as the statutory exemp-

---

7. In order to compare the colloquy that occurred in this case, *see supra* note 6, with the court's tirade in *Webb*, we quote in full the *Webb* court's speech to the prospective witness, who was then serving a prison sentence.

Now you have been called down as a witness in this case by the Defendant. It is the Court's duty to admonish you that you don't have to testify, that anything you say can and will be used against you. If you take the witness stand and lie under oath, the Court will personally see that your case goes to the grand jury and you will be indicted for perjury and the liklihood [sic] is that you would get convicted of perjury and that it would be stacked onto what you have already got, so that is the matter you have got to make up your mind on. If you get on the witness stand and lie, it is probably going to mean several years and at least more time that you are going to have to serve. It will also be held against you in the penitentiary when you're up for parole and the Court wants you to thoroughly understand the chances you're taking by getting on that witness stand under oath. You may tell the truth and if you do, that is all right, but if you lie you can get into real trouble. The court wants you to know that. You don't owe anybody anything to testify and it must be done freely and voluntarily and with the thorough understanding that you know the hazard you are taking.

*Webb*, 409 U.S. at 95–96, 93 S.Ct. at 352.

tion criteria in *Duren* which systematically excluded women from jury venires. *Duren*, 439 U.S. at 367, 99 S.Ct. at 670.

■ The trial court allowed defense counsel to take testimony from the Clerk and Deputy Clerk of the Court—those persons in the best position to testify with respect to any systematic inclusion of law enforcement-related persons in the jury selection process. Yet, defense counsel failed to ask a single question relating to the jury-selection process. State transcript, record, vol. 1, at 75–81. Because appellant did not seize his opportunity to make a showing of this necessary element of his claim, the court did not offend constitutional principles in denying the motions to quash or for a continuance.

### VII.

Mr. Trujillo's sixth argument in this petition, comprised of two points, is that his rights to present a defense and to due process were violated by the State's refusal to provide him with certain requested material. Mr. Trujillo first challenges the court's refusal to order the State to provide discovery relating to possible riot-related charges against Mr. Trujillo himself, the State's inmate witnesses, and potential defense inmate witnesses.

Defense counsel claim that, to effectively represent Mr. Trujillo, they needed to know whether he faced any riot-related charges in order to determine both whether a fifth amendment privilege was available and whether Mr. Trujillo should testify. He did not testify in his defense. They also claim that notice of possible pending charges against State witnesses were critical in order for Mr. Trujillo to effectively exercise his sixth amendment right to confront and cross-examine the witnesses against him. Finally, they contend that their decision whether to call various defense witnesses rested in part on their criminal records as well as their participation in riot-related events and that denial of this disclosure abridged Mr. Trujillo's right to present a defense under the sixth and fourteenth amendments.

■ The information requested here relates not to charged crimes but more generally to what the possible outcome of ongoing investigations may be. The limited usefulness of such information, particularly in light of its speculative nature, does not outweigh the state's legitimate interest in protecting against the premature release of material relating to ongoing, sensitive investigations of unrelated crimes. The 1980 riot is only tangentially related, if at all, to the present case. The requested material could not be exculpatory. Impeachment of either Mr. Trujillo or state or defense inmate witnesses with any material obtained from the riot prosecution office would be indirect at best. Material relating to the riot would not directly undermine the witness' testimony, as would a prior inconsistent statement regarding the events immediately surrounding the stabbing of Barbershop. Instead, it could only be used to attack generally the witness' credibility. Their prior criminal records and current status as inmates already provide material for such general impeachment.

Moreover, the witnesses, as well as Mr. Trujillo himself, are still inmates at the New Mexico Penitentiary. We could not ignore the possibility of reprisals upon their return to the prison population if the requested material did, indeed, publicly and prematurely reveal their participation in the 1980 riot. This risk also outweighs any limited usefulness which the information may have for the defense in this case.

More difficult is Mr. Trujillo's second contention under this point of appeal. On July 7, 1981, Mr. Trujillo demanded production of "[a]ll materials, information, transcripts, investigative reports, tape recordings, and records relating to possible criminal charges and for cases pending against [Barbershop] at the time of his death...." Record, supp. vol. 2, at 259. On July 20, 1981, he further demanded "production of all records, files, and materials in possession of the District Attorney's Office, Riot Prosecution Division, which materials pertain to possible pending charges against the following...." *Id.* at 313. Among the

eleven names listed was the victim, Barbershop. The motion further stated with specific reference to Barbershop that "[u]pon information and belief, these materials will be exculpatory in nature...." *Id.*, supp. vol. 2, at 314. On July 24, 1981, the court ordered the State to "turn over all exculpatory information to the defense relating to the alleged victim in this cause, [Barbershop]." The court further ordered "that the State provide the Court with any materials relevant to this case where it has a question concerning its exculpatory nature, within three days from July 27, 1981, for an *in camera* inspection." *Order, id.* at 367. On July 27, 1981, the defense formally notified the State that it might rely on a theory of self-defense at trial. *Id.* at 336.

The defense never received before trial any information gathered in the ongoing investigation of the New Mexico Penitentiary Riot in 1980 regarding Barbershop's alleged participation in that riot. A motion for a new trial was filed when such information was learned from counsel defending riot-related cases.[8] At a hearing on the new trial motion, the court received exhibits reciting eyewitness accounts of Barbershop's alleged participation in several riot-related murders. The State conceded at that time that all of the defense exhibits were in the State's possession prior to the trial. Nonetheless, the court ruled that the nondisclosure did not prejudice Mr. Trujillo, because he was able to present substantial evidence of the victim's reputation for violence at his trial.

■ In *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1197, 10 L.Ed.2d 215 (1963), the Supreme Court held that suppression of material[9] evidence justifies a

---

**8.** There seems to be inconsistent authority in New Mexico as to whether the evidence of specific acts of violence would have been admissible in this case, even if it had been disclosed.

Rule 405(b) of the New Mexico Rules of Evidence provides: "In cases in which character or a trait of character of a person is an essential element of a charge, claim, or defense, proof may also be made of specific instances of his conduct." *State v. Bazan,* 90 N.M. 209, 561 P.2d 482 (Ct.App.1977), reiterates that where character is an essential element of a defense, it may be proved by evidence of specific acts of conduct. 561 P.2d at 487. The case further implies that the victim's traits of aggressiveness and recklessness are "essential elements" of the defense of self-defense and that evidence of specific acts demonstrating the victim's aggressiveness are thus admissible whenever self-defense is asserted. *Id.* 561 P.2d at 486–88.

However, more recent authority states that "evidence of specific acts of violence on the part of the deceased could be introduced by a defendant *if there was evidence that the defendant had been informed of, or had knowledge of, those acts at the time of the homicide.* Such evidence would have some bearing on the reasonableness of defendant's apprehension for his life." *State v. Ewing,* 97 N.M. 235, 638 P.2d 1080, 1082 (1982) (emphasis added) (quoting *State v. McCarter,* 93 N.M. 708, 604 P.2d 1242, 1246 (1980)). In *Ewing,* the defendant claimed he acted in self-defense. Because there was no clear evidence that the defendant had knowledge of the victim's thirty-two and thirty-three-year-old convictions for assault with a deadly weapon and voluntary manslaughter, respectively, the New Mexico Supreme Court affirmed the trial court's ruling that evidence of the convictions was inadmissible.

In the present case, no evidence in the record indicates that Mr. Trujillo was aware of the specific instances of conduct which the defense would have attempted to admit in arguing that Mr. Trujillo reasonably feared for his life and acted in self-defense. Like the defendant in *Ewing,* Mr. Trujillo did not testify. The federal cases cited by Mr. Trujillo in contending that evidence of specific acts is admissible to prove that the victim was the initial aggressor, whether or not the defendant knew about the conduct, are inapposite. They interpret the Federal Rules of Evidence, not the New Mexico Rules of Evidence. As this was a state court trial, we are bound by the New Mexico Rules as interpreted by that State's highest court.

Nevertheless, because the state of the law in New Mexico is less than clear on the subject, we will assume that such evidence would have been admissible.

**9.** When evaluating "materiality" in the *Brady* context, the usual legal denotation of the word "material" in the evidentiary sense must be clearly distinguished from the word's meaning in this constitutional sense. The use of the word "material" as the benchmark in both circumstances is unfortunate, for its meaning in the two contexts is radically disparate. Evidence clearly "material" and admissible as a threshold proposition may be deemed to be "immaterial" in retrospect in a *Brady* inquiry.

In the evidentiary sense, we are narrowly looking to whether the proposition toward which the evidence is directed is a necessary element of the crime or a defense. In the constitutional sense, we are looking at the entire trial to determine whether the defendant's conviction was obtained by violating due process, whether his or her trial was tainted with funda-

new trial "irrespective of the good faith or bad faith of the prosecution." The Court has held that "evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 3384, 87 L.Ed.2d 481 (1985).

In making this inquiry, we must avoid concentrating on the suppressed evidence in isolation. Rather, we must place it in the context of the entire record. Evidence that may first appear to be quite compelling when considered alone can lose its potency when weighed and measured with all the other evidence, both inculpatory and exculpatory. Implicit in the standard of materiality is the notion that the significance of any particular bit of evidence can only be determined by comparison to the rest.

The undisclosed evidence in this case goes toward establishing Barbershop's propensity for violence, supporting Mr. Trujillo's claim of self-defense. Appreciable evidence was admitted at trial substantiating Barbershop's violent tendencies; nonetheless, the jury rejected defendant's claim of self-defense. Thus, we must review both what was admitted and what was not disclosed with respect to Barbershop's propensity for violence. The final inquiry, in essence, is whether the *additional* evidence of Barbershop's violent character might have materially affected the verdict.

The undisclosed evidence consisted of statements of several prisoners taken by various officers. Nearly all of the statements concerned events allegedly occurring during the two-day prison riot in 1980 and all implicated Barbershop in violent crimes.[10] Barbershop apparently had not been charged with any of the crimes that the statements describe at the time of his murder.

The evidence admitted at trial with respect to Barbershop's violent character included: (1) his prior convictions for armed robbery and conspiracy to commit aggravated battery, state transcript, record at 1060–61, 1063–64; (2) testimony that Barbershop had bragged of both "planting" unspecified individuals during the riot and participating in the murder of Cruz Hill, *id.* at 1040–42; and (3) various prison misconduct reports filed against Barbershop, including fighting and possession of weapons, *id.* at 1062, 1064–65. One inmate, testifying that Barbershop had a reputation for being "extremely violent," stated:

> "Barbershop" would brag about the incidents that he had been involved with.... And he constantly reminded everybody that he was one of the people who killed [Cruz Hill].
>
> After the riot, on several occasions, he bragged about different people that he had supposedly planted.
>
> On one occasion in Cellblock 2 he slapped around a young inmate and sexually assaulted him, and asked me if I wanted to participate, which I answered, "No."
>
> Those are just a few of the incidents that I know of.

*Id.* at 1042–43. The inmate also testified that he had observed that Barbershop was armed on at least seven occasions. *Id.* at 1044.

■ While the undisclosed statements significantly bolster the admitted evidence regarding Barbershop's violent tendencies,

mental unfairness because certain evidence was not disclosed to the defense.

10. The statements of three inmates, Juan Rodriguez, Steven Kuchar, and Darrell Stanley, concerned the murders of James Foley and Danny Waller, which named Barbershop, among others, as one of the perpetrators. Mr. Rodriguez' statement also named Barbershop among those involved in the beating of Robert Agnes. The statement of Michael Jack Roland described the murder of Joe Madrid, naming Barbershop, among others, as one of the perpetrators. The statement of Peter Laycock concerned the sodomy of several inmates by Barbershop and implicated him in the murders of Filiberto Ortega and Frank Ortega. The statement of Danny Macias discussed the pre-riot murder of one "Cruz" for "some weed." The statement of Reagan Broxson described generally the riot activities of Barbershop, among others. Appellant's Brief in Chief at 15–16.

in reviewing the record as a whole we cannot say that the result of the proceeding would have been different had the material been disclosed. The undisclosed evidence presented no new issue critical to Mr. Trujillo's guilt or innocence; the evidence was simply cumulative. The accounts sought to be introduced would have merely parroted the victim's own admissions, already in evidence, about murdering several people during the riot, as well as Cruz Hill. The victim's own boasts concerning these murders not only serve to demonstrate his propensity for violence, they are much more cogent evidence of his violent tendencies than third-party accounts of the same events.

Nor did the evidence directly relate to the events surrounding the murder, such as an undisclosed eyewitness that could corroborate Mr. Trujillo's claim of self-defense. It was merely character evidence which the defense hoped would *circumstantially* prove that the victim was the initial aggressor or that Mr. Trujillo reasonably feared for his life because of his knowledge of Barbershop's past deeds.

Moreover, the jury may well have discounted the testimony of other inmates regarding occurrences unverified by formal charges and allegedly occurring for the most part during the very unusual circumstances of the 1980 prison riot. In light of the other evidence of guilt, including Mr. Garcia's statement that he and Mr. Trujillo planned Barbershop's murder, *see infra*, we cannot say that the jury would have likely accepted Mr. Trujillo's claim of self-defense had this additional, cumulative character evidence been disclosed and admitted. We are satisfied that the trial court committed no constitutional error in declining to order a new trial on the basis of this newly discovered evidence.

## VIII.

Mr. Trujillo next contends that the trial court improperly admitted out-of-court statements made by his co-defendant, Ricky Garcia, shortly before the incident. Mr. Garcia's statements to another inmate were to the effect that he and Mr. Trujillo planned to kill the victim. The court admitted the evidence under the authority of Rule 801(d)(2)(E) of the New Mexico Rules of Evidence, the co-conspirator exception, under which a statement is admissible if made "during the course and in furtherance of the conspiracy." Mr. Trujillo argues primarily that there was no evidence, independent of the challenged statements themselves, supporting the inference that a conspiracy existed prior to the altercation. Therefore, he concludes, the statements were inadmissible. *See State v. Farris,* 81 N.M. 589, 470 P.2d 561 (Ct.App.1970) (exception does not apply to statements made prior to conspiracy).

Under New Mexico law, "there must be prima facie proof of the conspiracy independent of testimony admissible under the coconspirator rule." *State v. Jacobs,* 91 N.M. 445, 575 P.2d 954, 957 (Ct.App. 1978); *see also State v. Sheets,* 96 N.M. 75, 628 P.2d 320, 322 (Ct.App.1981). Nevertheless, the trial court has wide discretion regarding the order of proof, and the co-conspirator statement may be admitted prior to the submission of prima facie proof of conspiracy. *State v. Armijo,* 90 N.M. 12, 558 P.2d 1151, 1153–54 (Ct.App.1976).

After reviewing the record, we are satisfied that sufficient independent evidence establishing the existence of a conspiracy at the time the statements were made was admitted prior to and subsequent to the admission of the co-conspirator statement to uphold the trial court's evidentiary ruling in this case. The dying declarations of Officer Jewett, as well as the testimony of three other guards, described a concert of action by the two defendants throughout the incident. An inmate witness to the struggle testified that the shanks used by each of the defendants in the killings were apparently exchanged during the scuffle. Moreover, he testified that both defendants, at the conclusion of the stabbing incident, ran together through the back of the cellblock tier and apparently disposed of the shanks.

In determining whether a conspiracy exists at the time of a challenged statement, the trial court may consider the in-

ferences reasonably drawn from the evidence submitted. The apparently planned cooperation between the defendants, which is sufficient circumstantial evidence to support the mutually implied understanding necessary to establish a conspiracy, is an adequate foundation for the inference that the conspiracy existed at least shortly before the fight, when the challenged statement was made. *Cf. State v. Thoreen*, 91 N.M. 624, 578 P.2d 325, 329 (Ct.App.1978) (mutually implied understanding necessary to establish common design or agreement may be proved by circumstantial evidence). Therefore, we hold that there was a sufficient evidentiary basis supporting the admission of Ricky Garcia's statement.

### IX.

Prior to indictment in the present case, Mr. Trujillo was charged with escape and conspiracy to escape. In connection with the escape trial, the court ordered a psychiatric examination of Mr. Trujillo. Over the objection of his counsel in the present cause, Mr. Trujillo's counsel in the escape case made a strategic decision regarding Mr. Trujillo's defense in that case and released the psychiatric report to the State. The report contained highly incriminating references to the present case. Counsel in the case at bar moved to suppress the report in this case. At a hearing on the motion, the state court ruled that the prior counsel had performed reasonably in his conduct of the escape defense but that the psychiatric report and its underlying data could only be used by the State in this case if Mr. Trujillo raised an insanity defense.

Mr. Trujillo asserts that his counsel in the escape case acted incompetently in turning over the report to the State and that such action had unconstitutional "carry-over" effects in this case. Specifically, he claims that his fifth amendment right against self-incrimination as well as his sixth and fourteenth amendment rights to present a defense and to effective assistance of counsel were abridged in that he was effectively denied an opportunity to present an insanity defense.

▮ The State did not use the contents of the report, and thus Mr. Trujillo's right against self-incrimination was not violated.

We agree with the state court that the earlier counsel performed reasonably under prevailing professional norms. *See Strickland v. Washington*, 466 U.S. 668, 688, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). Moreover, we find no "carry-over" effects from counsel's strategic decision in the unrelated proceeding that operated to violate Mr. Trujillo's right to present a defense in the present action. The court did not prohibit him from asserting an insanity defense if he so chose. Admittedly, the presence of the unfavorable psychiatric report in the State's possession made the prospect less attractive. The trial court did not violate any of defendant's constitutional rights, however, in ruling that the State could use such evidence, properly in its possession, in responding to an insanity defense.

### X.

▮ In addition to seeking conviction of Mr. Trujillo as a principal, the State also prosecuted him under accessorial liability and felony-murder theories. Because no particularized "intent to kill" is necessary for conviction under the latter two theories, Mr. Trujillo argues that the State violated his eighth and fourteenth amendment rights by seeking the death penalty at trial, even though he was not, in fact, sentenced to death. Mr. Trujillo cites no authority to support his position that it is unconstitutional to even *seek* the death penalty where such is disproportionate to the crime charged, nor do we find any support for it. The contention lacks merit.

### XI.

Finally, Mr. Trujillo contends that he was denied his confrontation and due process rights by the court's refusal to (1) require a state witness to answer certain defense questions, (2) continue the trial until he could feasibly answer such questions, and (3) order disclosure to the defense of the contents of a certain taped conversation.

State Police Officer Ross, a state witness, refused to answer certain defense deposition questions concerning his investigation of events at the penitentiary. He stated that disclosure could endanger lives and that the subject was a matter of ongo-

ing investigations. Specifically, he refused to identify an inmate who had contacted him regarding Mr. Trujillo's case and refused to comment on the membership of an alleged prison group, "Los Carnales," as described by an inmate state witness, Daniel Macias. The court then conducted an *in camera* hearing solely with Officer Ross. After the hearing, the court ruled that Officer Ross need not answer the defense questions because (1) the identity of the informant was not relevant to the case, and (2) as to the membership of Los Carnales, Mr. Trujillo not only had superior information, but also the danger of disclosure outweighed any probative value of the testimony. He further ruled that the State need not disclose the contents of a taped recording of a conversation between Officer Ross and Mr. Macias relating to Los Carnales.

Mr. Trujillo contests the trial court's refusal to conduct an adversarial hearing, as opposed to the private, *in camera* hearing by the court, with respect to Officer Ross' testimony, citing *Alderman v. United States*, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969), and *Taglianetti v. United States*, 394 U.S. 316, 89 S.Ct. 1099, 22 L.Ed.2d 302 (1969). In *Alderman*, the petitioner learned after his conviction for conspiring to transmit murderous threats in interstate commerce that his place of business had been subject to illegal electronic surveillance by the Government. The surveillance tapes, therefore, needed to be examined in order to determine whether any tainted evidence was used to convict the petitioner.

The Government argued that the records should first be submitted to the trial court for *in camera* inspection, and only those found arguably relevant would be turned over to the petitioner for examination. The Supreme Court rejected this procedure, finding that "the task is too complex, and the margin for error too great, to rely wholly on the *in camera* judgment of the trial court to identify those records which might have contributed to the Government's case." *Alderman*, 394 U.S. at 182, 89 S.Ct. at 971.

We could superficially distinguish *Alderman* by simply noting that it narrowly

dealt with a conviction possibly tainted by evidence unconstitutionally obtained through violating petitioner's fourth amendment rights. In the instant case, Officer Ross' testimony could not even arguably supply grounds for asserting that the evidence used to convict Mr. Trujillo was unconstitutionally procured. More to the point, however, the *Alderman* Court appreciated that reviewing months of surveillance tapes, any part of which could have supplied the link to any part of the evidence used to convict the petitioner, was a massive undertaking. The trial court in that case was simply not in a position to be able to determine whether any, some, or all of the evidence used at trial could possibly have been acquired through links supplied by the unlawful surveillance. The entire trial could have been infected. The *in camera* procedure in such a case is inadequate.

In the present case, the trial court was surely capable of evaluating Officer Ross' testimony regarding the two defense questions at issue while ensuring that Mr. Trujillo's constitutional rights were protected. Each case must be decided on its own facts. Just as in *Taglianetti*, "[u]nder the circumstances presented here, we cannot hold that 'the task is too complex, and the margin for error too great, to rely wholly on the *in camera* judgment of the trial court.'" *Taglianetti*, 394 U.S. at 317–18, 89 S.Ct. at 1100–01 (quoting *Alderman*).

We also reject Mr. Trujillo's contention that his rights were violated by the trial court's failure to continue the trial until such time as the contested questions could be answered. It is not clear when, or if, that time would arrive. In light of the trial court's evaluation that the probative value of this testimony was marginal, its refusal to grant a continuance did not rise to a constitutional violation.

We also find no due process violation in the court's refusal to order disclosure of the taped conversation between Mr. Macias and Officer Ross pertaining to Los Carnales. Mr. Trujillo argues that "[t]he defense was unable to test and cross-examine state witnesses Ross and Macias on direct testimony, relating to their supposed knowledge of 'Los Carnales'" and that

*Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), requires that we grant relief. Appellant's Brief in Chief at 50. However, the matter of Los Carnales was never brought up in the direct testimony of Officer Ross. Moreover, although Mr. Macias did testify to the existence of and membership of Los Carnales, we do not find that *Giglio* demands that we grant Mr. Trujillo's petition.

In *Giglio*, the Government failed to disclose an alleged promise of leniency made to its key witness in return for his testimony. The Government's case depended almost entirely on the witness' testimony. Since the reliability of this witness may well have been determinative of guilt or innocence, the critical nondisclosure affecting his credibility violated due process requirements. The present case is easily distinguishable. Even assuming the taped conversation contained material controverting Mr. Macias' brief testimony regarding Los Carnales, this matter was collateral to the chief issues in the case.

AFFIRMED.